E-FILED
Tuesday, 28 April, 2020  03:40:10 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CRISTY A. DUNN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19-cv-3076 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Cristy A. Dunn appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Dunn filed a Brief in Support of Motion for Summary Judgment (d/e 14).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 18).  The Plaintiff filed a Reply to Defendant's Motion for Summary Affirmance (d/e 19).  The parties consented to proceed before this Court.  <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered July 30, 2019 (d/e 12)</u>.  For the reasons set forth below, this the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

Plaintiff Dunn was born on May 4, 1985.  She completed two years of college.  She previously worked as a licensed practical nurse (LPN), emergency medical technician (EMT), cashier, and waitress.  Dunn suffered from fibromyalgia, congenital heart disease with remote history of surgery as an infant, asthma, and bilateral hip dysplasia.  She alleged that she became disabled on August 4, 2014 (Onset Date).  Dunn last met insured status for Disability Benefits on March 31, 2015 (Last Date Insured).  Certified Transcript of Proceedings Before the Social Security Administration (d/e 8) (R.), 15, 17, 18, 40, 64, 65, 72, 562.

On September 9, 2014, Dunn saw Dr. Nathan Seaman, D.O.  Dunn complained of numbness, weakness, stiffness, and tingling in her legs.  She also reported decreased grip strength.  She was fatigued at times and her symptoms were worsening.  On examination, Dunn ambulated without assistance.  Dr. Seaman ordered blood tests and MRIs of her spine and brain.  R. 326-27.  The MRIs were unremarkable.  R. 509.

On September 30, 2014, Dunn saw Dr. Seaman.  Dunn reported generalized joint pain.  She hurt with any movement.  On examination, Dunn ambulated without assistance.  Dr. Seaman prescribed Neurontin for joint pain.  R. 328-29.

On November 3, 2014, Dunn saw cardiologist Dr. Wissam F. Derian, M.D., for elevated CRP and chronic chest pains.  Dunn had congenital heart disease with patent ductus arteriosus (PDA) ligation at birth.  She had at birth small atrial septal defect (ASD) and ventricular septal defect (VSD) which closed spontaneously.  She also had a mild mitral valve prolapse (MVP).  Dunn reported chronic, constant left back pain, chest pain, and joint pain. She was tired during the day and snored loudly at night.  She had  no shortness of breath, palpitations, dizziness, or syncope and reported no exertional chest pain.  She had muscle aches.  R. 330.

On examination, Dunn was oriented and had normal reflexes.  Her cardiac exam showed normal rate and rhythm, normal pulses, normal effort, and normal breath sounds.  Her musculoskeletal exam showed normal range of motion.  R. 332.  Dr. Derian noted that Dunn's chest pain was atypical.  He wondered whether the pain was rheumatological but determined that any possible cardiac cause had to be investigated. Dr. Derian ordered a stress echocardiogram test, a full echocardiogram, and a sleep study.  R. 333.

On November 11, 2014, Dunn had the echocardiogram and stress echocardiogram test performed.  The echocardiogram showed normal diastolic function, normal left ventricle systolic function, and normal right

ventricular  function.  Her ejection fraction was estimated at 50 - 55 %.
Dunn had a mild enlargement of the left atrium and a mild mitral valve
prolapse.  She had no aortic stenosis or insufficiency.  R. 359.  The stress
echocardiogram was negative for ischemia but showed reduced functional
capacity.  R. 361.

On November 13, 2014, Dunn saw Dr. Seaman.  She reported feeling
more and more stiff and achy in joints, worse in the mornings or if she
stayed still "for a while."  She took about two hours to get going in the
mornings.  Hot showers helped and she took about four showers each day.
R. 334.  On examination, Dr Seaman observed "boggyness (sic) and
tenderness to mcp's [metacarpophalangeal joints], knees, shoulders." Dunn
ambulated without assistance. Dr. Seaman planned to refer Dunn to a
rheumatologist to evaluate for rheumatoid arthritis.  R. 335.

On December 4, 2014, Dunn saw Dr. Seaman.  She reported severe
right hip pain and leg pain.  The pain was worse with standing and driving
was "very painful."  She said that lying down and heat helped, and that
steroids and Neurontin "helped a little."  The steroids did not help "as much
as before."  R. 336.  On examination, Dunn ambulated slowly without
assistance. Dr. Seaman observed tenderness in the thoracic and lumbar

paravertebral muscles.  He ordered x-rays of Dunn's spine and increased the dosage of the Neurontin.  He suspected fibromyalgia. R. 337.

On January 6, 2015, Dunn saw Dr. Seaman.  She had "a lot of pain all over"  and was tender "even to light touch."  She reported that her feet were always cold and she had more leg pains with walking and pain in her feet. R. 338.  On examination, Dunn ambulated without assistance.  She had poor capillary refill in her feet and her pulses in her feet were "non-palpable."  Dr. Seaman ordered ultrasounds of her extremities and discussed coping mechanisms for fibromyalgia.  R. 339.

On February 27, 2015, Dunn completed a Function Report—Adult form (Adult Function Report).  R. 250-58.  Dunn said that during her day, she got up, got dressed, took her children to the school bus stop, did light housework, took care of her baby, fixed dinner, showered, and went to sleep.  She washed small laundry loads, loaded the dishwasher, and performed light vacuuming.  In taking care of the baby, Dunn changed diapers, fed the baby, and bathed the baby.  She also watched television, talked on the telephone with friends, and played games with her children. Her husband and children did laundry, dishes, sweeping, mopping, and heavier vacuuming.  Her husband also helped with childcare.  Dunn woke up three to four times at night due to joint pain and had to spend additional

time to take care of her personal hygiene and to dress herself.  R. 251-52.
She made sandwiches and some complete meals.  She made complete
meals three to four times a week which took one to two hours to prepare.
She sat on a barstool while she cooked. R. 252.  She did not work in the
yard due to her asthma.  R. 253.

Dunn reported in the Adult Function Report that she got out of the
house three to four times a week.  She drove and walked and went
shopping once a week for groceries and other household items.  The
shopping trips lasted one to two hours. She could handle her finances, and
also went to weekly Girl Scout meetings with her daughter.  She went out
to dinner with friends once a month.  R. 253-54.  She avoided large groups
of people because she "gets agitated with people." R. 255.

Dunn said in the Adult Function Report that her impairments affected
her ability lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs,
complete tasks, concentrate, use her hands, and get along with others.
She could walk 30 yards without stopping, lift 20 pounds, and pay attention
for 30 minutes.  She could not kneel for less than 10 seconds without pain
and squatting and bending hurt.  She could pay attention for 30 minutes
and she did not finish activities that she started, such as watching a movie,
doing chores, or reading a book.  She could follow written oral instructions.

R. 255.  She was fired because, "got into it with my boss more than once due to anxiety issues."  Dunn reported that she had difficulty coping with stress.  R. 256.  She concluded the Adult Function Report with the following:

> I was born severely premature 28 wks. gestation. 1lb. 13 oz. I had open heart surgery 24 hrs old.  Have had muscle & joint problems & breathing problems since birth.  The problems have gotten worse over the years.

R. 258.

On February 17, 2015, Dunn saw Dr. Seaman.  She reported "a lot of fibromyalgia pains" and asked for pain medication.  R. 340.  Dr. Seaman prescribed tramadol as needed and advised Dunn to "use very sparingly." R. 341.

On March 24, 2015, Dunn saw Dr. Seaman.  Her fibromyalgia pain was very severe with tenderness and muscle cramps and she had a hard time picking up her children.  Her muscles felt weaker like they were atrophying.  R. 461.  On examination, Dunn ambulated without assistance. She had multiple tender points all over her body.  Dr. Seaman adjusted her medications.  R. 462.

On April 28, 2015, Dunn saw Dr. Seaman.  She reported she injured her right knee and hip when she misjudged a step when she stepped off a curb.  The knee and hip were stiff and sore and she had difficulty walking.

Something did not feel right in the knee and the knee was painful in both the front and back.  She had no swelling.  R. 463.  On examination, Dunn ambulated very slowly with pain.  She had limited range of motion in the right knee both in flexion and extension.  The knee was tender to palpation. Dr. Dunn ordered x-rays of the knee and hip and administered a Toradol injection.  R. 464.  The x-rays of the right hip showed no fracture or degenerative changes.  There were no acute findings.  R. 484.  The x-ray of the right knee was unremarkable with no evidence of joint effusion or fracture.  R. 483.

On May 5, 2015, Dunn saw Dr. Derian.  Dr. Derian noted that the November 2014 stress test was normal.  Dunn said she felt better.  She had no shortness of breath, no palpitations, dizziness, or syncope.  She had no leg edema and exertional chest pain.  She had muscle aches.  R. 465.  Dr. Derian's cardiac examination was normal, and his musculoskeletal exam showed normal range of motion.  R. 467.  Dr. Derian still recommended a sleep study, weight loss, exercise, and cessation of smoking.  R. 468.

On May 13, 2015, Dunn saw physical therapist Martha Blakely, PT., for worsening knee and hip pain after the incident stepping off the curb. Dunn said she had chronic hip pain, but the knee pain was new.  She had

pain in the front and back of the knee and muscle spasms in the knee and hip.  She had numbness and tingling in her entire right leg, which became worse with prolonged sitting.  Her pain was aggravated by bending her knee, walking, sitting, and lying down in certain positions.  R. 470.  On examination, Dunn had some edema and tenderness on palpation in her knee and leg.  She had limited range of motion in her knee and hip and had an antalgic gait with decreased stance time. R. 471.  Blakely assessed decreased motion and strength, poor posture, gait deficits, increased pain, and joint dysfunction and recommended physical therapy twice a week for six weeks.  R. 472.

On May 19, 2015, Dunn saw physical therapy assistant Chad Kunkel, PTA.  Dunn reported that some of the exercises were hard.  She also said she was walking every day and doing the things she wanted to do even if she was in pain.  R. 474.  On May 21, 2015, Dunn saw Blakely for her physical therapy session.  She said that her joints were feeling "normal." They had a "normal tightness."   She started a gentle walking regimen.  Her pain was at a 3/10 both before and after the therapy session.  R. 476.

On June 16, 2015, Dunn saw neurologist Dr. Douglas Sullivant, M.D. for migraine headaches and weakness and fatigue in her arms and legs. Dunn reported diffuse pain all over, worse in the last six months, and

weakness and fatigue.  Her legs felt heavy if she walked any distance and felt like they were going to give out on her.  R. 509.  On examination, Dunn had 5/5 strength throughout, and her gait was within normal limits.  She could heel walk, toe walk, and tandem walk without difficulty. Dr. Sullivant noted that the brain and spine MRI done in 2014 were unremarkable.  R. 509.  Dr. Sullivant found no motor deficits.  He counseled Dunn on the pain rebound effect from analgesic medications and recommended dietary changes to exclude caffeine from her diet, exercising, and quitting smoking. R. 514-15.

On July 27, 2015, Dunn saw nurse practitioner Daveda Voss, CNP, at the Pain Management Clinic at Blessing Hospital in Quincy, Illinois.  R. 540-42.  Dunn reported chronic pain all over her body, but worse in her right leg and hip.  The pain ranged from 3/10 to 10/10 and was 4/10 at the time of the visit. The pain was achy and sometimes burning or sharp and occasionally felt like a spasm.  She reported that the pain was fairly constant, began around 2010, and worsened "over the last three months." Her pain was aggravated by sitting, standing, lying, walking, turning, bending, lifting, and engaging in physical therapy and any prolonged activity. The pain improved with heat, cold, repositioning, and rest.  She said that medications helped in the past including Tramadol, Flexeril,

Lyrica, baclofen, and her mother's hydrocodone.  Voss noted that Dr.

Sullivant saw Dunn on May 15, 2015, for migraine headaches.  Dr.

Sullivant strongly encouraged Dunn to decrease analgesic use, increase

activity, quit smoking, and try cardiovascular level activity. Dunn initially

indicated that she did not participate in routine cardiovascular level activity

and then indicated she walked once a day for 15-20 minutes with her

children.  She went to physical therapy in June for about three weeks, but

the physical therapy made her pain significantly worse.  R. 540.

On examination, Dunn "was able to sit fairly comfortably throughout

the whole visit without having to reposition or stand."  R. 541.  The office

visit lasted for one hour and 10 minutes.  R. 542.  Dunn had a steady gait

but walked stiffly with slumped and rolled shoulders and bent at the hip.

She had "age appropriate" range of motion in her joints and her body and

extremity muscles were de-conditioned.  Her leg strength was strong and

equal bilaterally. Straight leg raising tests were negative in the sitting

position, but positive in the supine position.  She reported "tenderness to

touch over the majority of her body with multiple tenderness but no

significant trigger points."  R. 541.  Voss assessed, "Chronic body pain,

chronic low back pain with some radicular component, fibromyalgia versus

disuse syndrome."  R. 541.  Voss prescribed improved sleep hygiene,

taking 10-20 minute walks three times a day, and water exercises three times a week.  Voss referred Dunn to physical therapy for instructions on water exercise and home exercises to strengthen her core as well as toning and stretching.  R. 541.  Voss also adjusted her medications and spent 55 minutes of the visit in "explanation, discussion, and counseling" about the plan Voss recommended.  R. 542.

On August 15, 2015, Dunn called Voss' office to report that she was sitting in some bleachers and felt a "pop" and was experiencing worsening, radiating pain in the right side of her low back, her hips, and in the SI joint area.  Voss' office told Dunn that if this was a new pain, she needed to see her primary care physician for further work up of the problem.  R. 782.  X-rays of her right hip on August 18, 2015 showed no fracture or dislocation, no significant arthropathy, and no osseous findings.  R. 549.

On September 3, 2015, Dunn saw Dr. Seaman.  She was still having "quite a bit" of pain, but the Lyrica was helping "quite a bit."  She was trying to walk twice a day for 20 minutes, but said that the second walk made things worse.  She had no headaches or blurred vision and was otherwise feeling fine.  R. 605-06. On examination, Dunn ambulated without assistance and had multiple tender points on the knees, elbows, shoulders,

back, and hips.  Dr. Seaman recommended taking one walk a day and gradually increase her activity as tolerated.  R. 606.

On September 9, 2015, Dunn met with qualified mental health professional Emily Morgan QMHP Mental Health Center of Western Illinois. Morgan interviewed Dunn and completed a form entitled Comprehensive Mental Health and /or Substance Abuse Assessment (Adult).  R. 553-86. Dunn discussed with Morgan why she could not work as an LPN due to her pain:

> The client reports her fibromyalgia and pain she can't do the things required that an LPN has to do like lifting heavy things. The client reports she was just seen in the emergency room a few days ago because she pulled half the muscles in her back. At first the client reports not working bothered [her] but she does enjoy being at home with her kids. The client reports she does do volunteering quite a lot because that doesn't require heavy lifting or long hours on your feet.

R. 562.  Morgan diagnosed depression not otherwise specified and recommended individual counseling.  R. 582, 586.

On September 10, 2015, Dunn saw nurse practitioner Daveda Voss again.  Dunn reported 50 percent overall improvement with less sharp pain and less tightness. The change in her medications made her less drowsy and improved her condition.  Her pain ranged from 4/10 to 10/10 and was 4/10 at the time of the visit.  Voss noted that Dunn was "actually quite pleased with her improvement."  R. 782.

On examination, Voss again noted that Dunn was "able to sit very comfortably throughout the complete visit without needing to reposition or stand due to pain."  R. 782.  The office visit lasted 45 minutes.  R. 783. Dunn's gait was steady, and she had normal range of motion for her age. Her legs strength was strong bilaterally and she had palpable trigger points over the upper trapezius and through the bilateral hip area.  Voss renewed her recommendations for exercise and physical therapy and scheduled trigger point injections.  Voss spent approximately 35 minutes of the 45-minute appointment "in explanation, discussion, and counseling."  R. 783.

On September 28, 2015, Dunn saw nurse practitioner Voss for the scheduled trigger point injections.  She reported continuing 50 to 60 percent overall improvement, but with continuing pain especially in the neck, shoulders, and lower back.  On examination, Dunn again "was able to sit very comfortably without having to reposition or stand due to pain." Her gait was steady, and she had multiple tender points throughout her trapezius muscles and her lumbosacral area.  R. 785.  Voss administered 27 trigger points injections.  Dunn reported significant improvement in her pain immediately following the injections.  R. 786.

On October 26, 2015, state agency physician Dr. Richard Lee Smith, M.D., prepared a Physical Residual Functional Capacity Assessment of

Dunn.  R. 79-81.  Dr. Smith opined that through the Date Last Insured
Dunn could occasionally lift 10 pounds; frequently lift less than 10 pounds;
stand and/or walk for two hours in an eight-hour workday; sit for six hours
in an eight-hour workday; frequently climb ramps and stairs; never climb
ropes, ladders, and scaffolds; occasionally stoop, crouch, and crawl; avoid
concentrated exposure to extreme cold, fumes, gases, odors, dust, poor
ventilation, and hazards. R. 79-81.

On November 6, 2015, Dunn saw rheumatologist Dr. Jason Guthrie,
M.D., for a clinical evaluation of fibromyalgia.  Dunn had diffuse myalgias
and arthralgias for the last three years and she did not sleep well.  On
examination, her gait was normal, her grip strength was reduced but
symmetrical, and she had 16 of positive 18 trigger points.  Dr. Guthrie
assessed fibromyalgia and recommended low impact aerobic exercise and
weight loss.  He also recommended a sleep study.  R. 748.

On March 18, 2016, state agency physician Dr. James Hinchen,
M.D., prepared a Physical Residual Functional Capacity Assessment.  R.
96-99.  Dr. Hinchen opined that as of the Date Last Insured, Dunn could lift
10 pounds occasionally and frequently; stand and/or walk for 2 hours in an
eight-hour workday; sit for six hours in an eight-hour workday; frequently
push and pull; occasionally climb ramps and stairs; never climb ropes,

ladders, and scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; and avoid concentrated exposure to extreme cold, fumes, gases, odors, poor ventilation, and hazards.  R. 96-98.

On April 20, 2016, Dunn had an echocardiogram and a stress test. The echocardiogram showed normal ventricular function.  The ejection fraction was 60%.  The left atrium was mildly enlarged, and the right atrium was normal.  Dunn showed no signs of aortic stenosis or insufficiency and had a mild mitral valve prolapse.  R. 726.  The stress test was negative for ischemia.  R. 723-24.

On September 6, 2016, Dunn saw Dr. Rishi Sharma, M.D., for right hip and knee pain.  She said the pain was constant and came on suddenly after she fell a week earlier.  Rest made the pain better and movement made the pain worse.  Dunn used a wheelchair to ambulate.  On examination, Dunn's hip was tender, and range of motion was limited with internal and external rotation.  She had pain on loading pressure on the acetabular joint and had effusion on the knee.  The knee had unlimited range of motion and was tender to palpation.  Straight leg testing was negative.  Dr. Sharma ordered MRIs of the right hip and knee.  R. 641-42.

On September 15, 2016, Dunn had an MRI of her right hip. The MRI showed right-sided femoroacetabular impingement, mild bilateral coxa

valga deformities, and mild symphysis pubis degenerative joint disease.
The MRI showed no labral tears or paralabral cysts, and no atrophy or
edema.  R. 916.

On September 27, 2016, Dunn saw Dr. Sharma, M.D., for right hip
and knee pain.  She had had the pain for weeks and the onset of the pain
was sudden.  The pain was better with rest and worse with movement.  On
examination, Dunn ambulated independently without the use of a device.
Dr. Sharma said the MRI of the right knee was negative for derangement.
The MRI of the right hip was consistent with mild acetabular impingement.
Dr. Sharma assessed right knee patellofemoral syndrome and right hip
femoral acetabular impingement syndrome.  R. 640.  He recommended
rest, ice, compression, and elevation and that Dunn bear weight on the leg
as tolerated.  R. 640.

On October 20, 2016, Dunn had an echocardiogram.  The results
showed substantially similar to the results from the November 11, 2014
echocardiogram with normal function and with her left atrial mildly enlarged.
R. 632.

On November 1, 2016, Dunn saw physical therapist Blakely.  She
reported that her right hip was worse, but her right knee was better.  Her
knee was much better since she started wearing compression stockings

and using a pillow to support her knee at night.  She rated her hip pain at 7/10 and her knee pain at 2/10.  R. 750.

On November 3, 2016, Dunn saw Dr. Seaman.  Dr. Seaman said Dunn was going to have surgery on her right hip.[1]  Dr. Seaman stated, "Became disabled 3/30/2015. Has a hard time standing, moving, getting up from sitting.  Cannot walk more than 200 feet without having to stop and rest. Uses a cane."  On examination, Dunn ambulated with a cane in her right hand.  R. 666.  X-rays of the left hip showed no fracture or dislocation and no osseous findings in the pelvis or left hip.  R. 717-18.  On November 11, 2016, x-rays of Dunn's hip showed possible bilateral acetabular dysplasia.  R. 737.

On November 29, 2016, Dunn saw Dr. Christopher Bieniek, M.D. She reported bilateral hip pain.  On examination, Dunn had full range of motion in the hips and tenderness along the trochanteric bursa bilaterally. She ambulated with a cane and had an antalgic gait.  Dr. Bieniek administered steroid injections into both trochanteric bursas.  R. 824.

On December 27, 2016, Dunn saw Dr. Bieniek.  On examination, Dunn had positive straight leg testing on the right and tenderness along the right trochanteric bursa.  She ambulated with a cane and had an antalgic

---

[1] The parties and the ALJ do not cite to any records of any surgery on Dunn's hip.

gait.  Dr. Bieniek administered a steroid injection in the right trochanteric bursa.  R. 821.

On January 17, 2017, Dunn saw Dr. Bieniek.  Dunn's MRI showed a minor right hip dysplasia.  Dr. Bieniek diagnosed minor right hip dysplasia and bursitis and administered a steroid injection into Dunn's right hip trochanteric bursa.  R. 810.

On April 11, 2017, x-rays of Dunn's hips and pelvis showed mild bilateral developmental hip dysplasia and femoral head asphericity.  R. 877.

On April 20, 2017, Dunn saw Dr. Seaman.  She had "disability forms" with her and reported having a hard time walking.  She said that a specialist told her she would need a wheelchair soon.  Dunn walked slowly with a cane.  Dr. Seaman prescribed a fentanyl patch for pain.  R. 881.

On April 27, 2017, Dunn saw a physical therapist.  Dr. Seaman prescribed a "Quad Cane" assistive device to aid Dunn in her walking.  The therapist instructed Dunn on the use of the Quad Cane on flat surfaces and on stairs.  R. 895.

On June 27, 2017, Dunn saw advanced practice nurse Kayla Sipes, APN, in Dr. Seaman's office.  Dunn complained of wrist pain and said she fell the preceding Saturday.  She said her wrist was swollen with numbness

in her fingers.  She iced and wrapped her wrist after the fall.  X-rays showed no fracture, dislocation, swelling, or degenerative changes.  R. 903-04, 912.

On the same day, June 27, 2017, Dunn had another MRI of her right hip.  The MRI again showed right-sided femoroacetabular impingement, mild bilateral coxa valga deformities, and mild symphysis pubis degenerative joint disease.   The MRI again showed no labral tears or paralabral cysts, and no atrophy or edema.  R. 913.

On September 7, 2017, Dunn saw Dr. Seaman.  Dunn asked if she would qualify for a wheeled walker.  She told Dr. Seaman she needed a list of her diagnoses and said she was scheduled to have a disability hearing on December 6, 2017.  She reported pain while walking and felt unsteady with a cane.  She was afraid of falling and could only walk 200 feet before she needed to sit and take a break.  On examination, Dunn ambulated bent over with a cane.  R. 920-21.

On September 15, 2017, Dunn saw Dr. Seaman.  She walked with a wheeled walker she borrowed from a friend.  Dr. Seaman completed paperwork for a wheelchair for Dunn.  R. 931.

On October 10, 2017, Dunn saw Dr. Travis Moore, D.O., in Dr. Seaman's office.  She complained of right shoulder pain after a fall.  On

examination, she had normal strength in her right upper extremity.  Her

sensation was intact and she had some tenderness on palpation.  Dr.

Moore prescribed a sling and told her to keep the arm in the sling for two to

three days.  R. 940-41.

On December 4, 2017, Dr. Seaman wrote a letter and completed

form entitled Medical Source Statement of Ability to do Work-Related

Activities (Physical) (Medical Source Statement).  R. 950, 954-57.  Dr.

Seaman stated in the letter,

> It is my medical opinion that Cristy A. Dunn is not able to work
> secondary to the following medical conditions.
>
> In 1985 she was diagnosed with heart disease and started on
> ASA 325mg daily.   This condition had associated symptoms of
> angina, pleurisy, and dyspnea on exertion with generalized
> fatigue.  She also has a restrictive lung disorder.
>
> She was also diagnosed with congenital hip dysplasia in 1985.
> This has caused her severe pain in the hips and low back and
> knees for over 30 years. This chronic pain has also contributed
> to her fatigue. She has had multiple treatments for this including
> oral and injectable steroids, topical analgesics, anti-
> inflammatory medications and narcotic pain medications. She
> also has had to use muscle relaxer off and on to control
> symptoms of associated muscle cramping and spasm.
>
> She was diagnosed with fibromyalgia in 2008. Her trigger points
> are found bilaterally at her knees, hips, low back, thoracic and
> cervical spine, posterior shoulder and elbows. She has tried
> physical therapy without any improvement of symptoms. She
> has also used lyrica and vicodin which minimally help with
> symptoms. She has also tried trigger point injections without
> much success at alleviating pain.

If you have any questions or concerns, please don't hesitate to call.

R. 950.  Dr. Seaman opined in the Medical Source Statement that Dunn could occasionally and frequently lift less than 10 pounds, stand and walk for less than two hours, sit for less than 2 hours, sit for no more than 10 minutes before needing to change positions, and stand for no more than 10 minutes before needing to change positions.  Dr. Seaman opined that every 30 minutes Dunn needed to walk around for five minutes and to lie down.  Dr. Seaman opined that Dunn needed to be able to change at will from sitting, standing, and walking.  Dr. Seaman stated as the medical findings to support these opinions, "chronic bilateral hip dysplasia and associated pain."  R. 954.

Dr. Seaman opined that Dunn could never twist, stoop, bend, crouch, climb stairs, or climb ladders.  Dr. Seaman stated that these opinions were supported by the following medical findings, "unstable with walking independently. Need wheeled walker.  Has limited ROM in bilateral hips [illegible] to structural congenital abnormalities."  R. 955.

Dr. Seaman opined that Dunn could never reach, push or pull; and could occasionally handle, finger, and feel.  Dr. Seaman stated that these opinions were supported by the following medical findings, "Fibromyalgia

flares with repetitive motions."  R. 955.  Dr. Seaman opined  that Dunn

should avoid all exposure to extreme cold; extreme heat; high humidity;

fumes, odors, dusts, and gases; perfumes; soldering fluxes;

solvents/cleaners; and chemicals.  R. 956.  Dr. Seaman stated that Dunn

was "unsteady with standing/ambulation. Dyspnea on exertion." R. 956.

Dr. Seaman opined that Dunn would be absent more than four days a

month from work; would be off-task more than 25 percent of the time at

work; and would need unscheduled breaks every 30 minutes, with each

break lasting 15 to 20 minutes.  Dr. Seaman agreed that Dunn's disability

began on August 5, 2014.  R. 957.

THE EVIDENTIARY HEARING

On December 6, 2017, the Administrative Law Judge (ALJ)

conducted an evidentiary hearing.  R. 36-71.  Dunn appeared with her

counsel.  Vocational expert Amelia Shelton appeared by telephone.  R. 38.

Dunn testified first.  She lived with her husband and her three children,

ages 11, 7, and 3 years old at the time of the hearing.  R. 43.  Their single

family residence had a ramp that led to the front door.  R. 51.  The ramp to

the front door had already been installed when they bought the house in

2012.  R. 59.

Dunn's husband worked 24 hours on, 24 hours off.  Her father-in-law lived with them from August 2014 to August 2016.  She had a baby in May 2014.  Her father-in-law moved to help take care of the children.  R. 58.  He and Dunn's mother helped with childcare. R. 49.  Her mother lived five miles from Dunn's home.  R. 59.

Dunn drove once a week to take her children to the school bus stop.  Her husband or a carpool took the children the other days.  Dunn stayed at the bus stop on the days she drove and watched all the children, including hers, get on the bus.  She said that in March 2015, she drove once a week like this, too.  She drove because the bus stop was too far away for her to walk.  She could not have walked to the bus stop on or about her Onset Date either. R. 43-45.

Dunn last worked in 2013 or 2014 as an EMT.  She stopped working because she could not lift patients and equipment required by the job.  She worked as an LPN before that and stopped that work because she could not lift and move patients and equipment required by the job.  R. 46.  She said that her body gave out from the pain in 2013.  She was fired from her LPN job in 2013 because of fatigue and an inability to do the job.  She then worked briefly as an EMT and was also fired from that job. R. 47-48.

Dunn was five feet two inches tall at the hearing.  Fifteen years before the hearing, she was five feet five inches or five feet six inches tall. She lost height because of the hip dysplasia and osteopenia.  Dunn weighed 160 pounds and her weight had been consistent.  R. 50.

Dunn started using a cane in 2014 because she fell several times. She switched to a walker in the year preceding the hearing.  She has seen several orthopedic specialists said that they recommended against surgery. She said that she was left with pain management.  R. 51-52.

Dunn has had fibromyalgia since 2008.  She said her pain was constant and was worse on the right.  Her fibromyalgia caused pain in her neck, back, shoulders, hips, knees, and breasts.  The pain varied from a sharp pain to a dull ache.  She also described that pain as constant, throbbing, and stabbing.  Dunn wore a fentanyl patch and took several doses of Vicodin and muscle relaxer each day.  She also took Cymbalta and cyclobenzaprine.  She tried meloxicam and steroid injections, but they did not help with the pain.  She also tried massage therapy.  None of these options relieved the pain, and the injections made the pain worse.  She suffered from daily fatigue and said she had suffered from fatigue for four years.  R. 53-55.

Dunn experienced chest pain twice a week from her congenital heart condition and the heart condition also affected her lungs.  The heart and related effect on her lungs contributed to her fatigue. R. 54-55.

Dunn had difficulty sleeping.  She went to bed at 8:00 p.m. and took two hours to fall asleep.  Her pain woke her up regularly during the night due, sometimes every two hours. R. 55.

Dunn spent most of her time during the day sitting in bed or in a chair. She was propped up by pillows in either the bed or the chair and she experienced hip pain while sitting.  She experienced discomfort after 10 minutes of sitting and after 10 minutes of standing.  Standing and sitting were equally painful, and walking was worse.  She could walk 200 feet with her walker and then needed to sit and rest.  She could lift 10 pounds.  R. 56-57, 63.

Dunn's husband and mother did the shopping.  Her husband, mother, and children did the housework.  Her father-in-law also helped with the housework when he lived with them.  R. 56-58.  If Dunn went to the grocery store, she rode in an electric cart.  In 2014, she would generally use an electric cart while shopping.  If she made a quick trip to the store, she would walk and lean on the grocery cart for support.  R. 60.

Dunn and her husband modified their bathroom to accommodate Dunn's limitations.  They installed a walk-in shower and a raised toilet seat to accommodate her condition.  R. 56-58.  They made these changes to their home "in the last part of 2014 into 2015." R. 57.

The ALJ asked Dunn about her report to Dr. Seaman on September 3, 2015 that she walked 20 minutes twice a day.  Dunn said she walked on a treadmill.  She tried to walk every day, but she usually could go only for five minutes before she had to stop. She used a treadmill so she could hold onto the side rails while walking.  R. 61-62.

Dunn could lift her baby initially, but she did not walk with her baby because she was afraid that she would fall.  Once her baby was eight or nine months old, she could "barely lift her."  R. 62.

Vocational expert Shelton testified.  Dunn's attorney stipulated to Shelton's qualifications as an expert.  R. 63-64.  The ALJ asked Shelton the following hypothetical question:

> So if you assume a hypothetical individual with those past jobs, same age as the claimant, 29 at the onset date, 32 now and the same education, two years of college and assume the individual could perform work at the sedentary exertional level, but no pushing and pulling frequent with the lower extremities, no climbing on ropes, ladders or scaffolds and no more than occasional climbing on ramps and stairs, stooping, kneeling, crouching or crawling, and the person should avoid concentrated exposure to pulmonary irritants, such as gas, fumes, odors, dust and work space with poor ventilation and the

> person should avoid concentrated exposure to extreme cold,
> and work hazards such as unprotected heights and being
> around dangerous moving machinery. Any past work available?

R. 65.  Shelton said such a person could not perform Dunn's past relevant

work.  R. 65.

Shelton opined that such a person could perform other jobs that

existed in the national economy, including example jobs of document

preparer, with 62,000 such jobs in the national economy; call out operator,

with 13,000 such jobs in the national economy; and charge account clerk,

with 21,000 such jobs in the national economy.  R. 65.

Shelton opined that the person described in the question could

perform these jobs even if the person needed to change from a sitting to

standing position every 30 to 60 minutes.  R. 66.  Shelton said the person

could perform the jobs if she had to change positions every 15 to 20

minutes.  The person, however, could not lie down at work except during

scheduled break times.  R. 68.  The person could also perform the example

jobs if she was limited to understanding, remembering, and carrying out

only simple instructions consistent with unskilled work.  R. 67.  Shelton said

the number of available document preparer jobs would be reduced by 50

percent if the person needed a walker to ambulate to and from the

workstation. R. 67.  The number of available call out operator and charge

account clerks would not be affected.  R. 68.  Shelton opined that the

person could be off-task a maximum of 15 percent of the workday and

retain employment.  The person could be absent from work during a 60 to

90 day probationary period, and thereafter, not more than 1 day a month.

R. 69.

The ALJ concluded the hearing.  R. 70.

<u>THE DECISION OF THE ALJ</u>

The ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that she is disabled

regardless of her age, education and work experience.  20 C.F.R. §§

404.1520(d), 416.920(d).  To meet this requirement at Step 3, the

claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so

severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden of presenting evidence on the last step; the Commissioner must present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Dunn met her burden at Steps 1 and 2.  She did not engage in substantial gainful activity from her Onset Date of August 4, 2014, to her Date Last Insured of March 31, 2015.  She suffered from the severe impairments of fibromyalgia; congenital heart disease with a history of ASD, VSD, and PDA with remote history of surgery; asthma; and mild bilateral hip dysplasia.  R. 18.  The ALJ determined at Step 3 that Dunn's

impairments or combination of impairments did not meet or equal a Listing.

R. 20.

The ALJ determined that Dunn had the following RFC through the

Date Last Insured:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform a full range of sedentary work as defined in 20 CFR 404.1567(a) except: she requires a sit-stand option allowing a change in position every 30 to 60 minutes for a few minutes at a time while remaining at the work station with no loss in production; no more than frequent pushing or pulling with the lower extremities; no climbing on ropes, ladders, or scaffolds; no more than occasional climbing ramps or stairs, stooping, kneeling, crouching, or crawling; should avoid concentrated exposure to pulmonary irritants such as gas, fumes, odors, dust, and workspaces with poor ventilation; and should avoid concentrated exposure to extreme cold and work hazards such as unprotected heights and being around dangerous moving machinery.

R. 19.  The ALJ relied on the medical records from before and after March

31, 2015, the Date Last Insured, that Dunn could ambulate independently

and that she had a steady gait.  The ALJ relied on the nurse practitioner

Voss' repeated observations in 2015 that Dunn sat comfortably without

needing to change positions during Dunn's visits with Voss.  One of those

visits lasted an hour and 10 minutes.  The ALJ also relied on the fact that

Voss and Dr. Sullivant's examination showed normal strength and on Dr.

Sullivant's advice to engage in regular cardiovascular exercise.  R. 22.  The

ALJ relied on the April 28, 2015 and August 18, 2015 x-rays that showed

no degenerative changes with her right hip. The ALJ noted that imaging did

not show an impingement in her hip until 2016, more than a year after the

Date Last Insured.  The ALJ also noted inconsistencies in Dunn's use of a

wheelchair in September 2016.  She first used a wheelchair to ambulate at

a visit with Dr. Sharma, but a week later she ambulated independently

without any assistive device when she visited Dr. Sharma. R. 22-23.  The

ALJ also relied on the stress tests and echocardiograms that showed no

ischemia and substantially normal cardiac function.  The ALJ further relied

on Dunn's report to Dr. Derian at her May 2015 office visit that she was

feeling much better.  Dr. Derian found that Dunn had full range of motion in

his November 2014 and May 2015 examinations.  R. 23-24.

The ALJ gave less weight to Dunn's testimony because the testimony

contradicted the medical records prior to or shortly after the Date Last

Insured.  Those records showed that she could ambulate independently

and could sit comfortably for extended periods.  The ALJ found that Dunn's

testimony about her limitations prior to the Date Last Insured was not

supported by Dunn's stress tests and echocardiograms which showed near

normal cardiac function, or by the April and August 2015 x-rays that

showed no degenerative changes in her right hip.  Dunn's testimony about

her condition prior to the Date Last Insured was also inconsistent with Dunn's February 2015 Adult Function Report in which she said that she took care of the baby, did light housework, took her older children to the school bus stop daily, did light loads of laundry and light vacuuming, shopped once a week for one to two hours, volunteered as a Girl Scout leader, and played Wii with her children.  R. 24-25.

In formulating the RFC, the ALJ also relied on the opinions of Drs. Hinchen and Smith.  The ALJ noted that Drs. Hinchen and Smith had the opportunity to review most of the medical records covering the time from the Onset Date to the Date Last Insured.  R. 25.

The ALJ did not give weight to the December 4, 2017 opinions of Dr. Seaman.  The ALJ noted that Dr. Seaman rendered these opinions two years after the Date Last Insured, the opinions were extreme and conclusory, and the opinions were inconsistent with the medical evidence from the Onset Date to the Date Last Insured.  The ALJ also noted that Dr. Seaman's other statements that Dunn was disabled were not medical opinions and were opinions on matters reserved to the Defendant Commissioner.  R. 26.

The ALJ determined at Step 4 that Dunn could not perform her prior relevant work through the Date Last Insured considering her RFC.  R. 27.

At Step 5, the ALJ found that through the Date Last Insured Dunn could perform a significant number of jobs that existed in the national economy. The ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and vocational expert Shelton's opinions that a person with Dunn's age, education, work experience, and RFC could perform the representative sedentary jobs of document preparer, call out operator, and charge account clerk.  R. 28-29.  The ALJ concluded that Dunn was not disabled.  R. 29.

Dunn appealed the ALJ's decision.  The Appeals Council denied her request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1.  Dunn then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, *1 (October 25, 2017) (original version, 2016 WL 1119029, at *1 (March 16, 2016)) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The examinations before the Date Last Insured showed that Dunn could ambulate independently.  Voss' notes in 2015 after the Date Last Insured showed that Dunn could sit comfortably for longer than 30 minutes at a time.  Dr. Derian's examinations in November 2014 and May 2015 showed full range of motion and the cardiac testing showed essentially normal cardiac function.  The April 28, 2015 and August 18, 2015 x-rays of Dunn's

right hip showed no degenerative changes or other abnormalities.  The November 20, 2016 x-ray was the first x-ray to show any hip dysplasia. That x-ray was taken more than18 months after the Date Last Insured.  The September 2016 MRI contained the first finding of an impingement in her right hip.  That MRI was performed more than 16 months after the Date Last Insured.

The opinions of Drs. Hinchen and Smith also provided substantial evidence to support the RFC determination.  In addition, Dunn told mental health counselor Morgan that she did what she wanted even with her pain. She also told Kunkel that she quit her LPN job because of the heavy lifting, but she did "volunteering quite a lot" because volunteering did not involve heavy lifting or being on her feet for extended periods.  R. 562.  All this evidence supported the ALJ's RFC finding that Dunn could perform a limited range of sedentary work through the Date Last Insured.

Dunn's condition deteriorated after she hurt her knee in April 2015, deteriorated more after she fell in September 2016, and then deteriorated further in 2016 and 2017.  The issue before the ALJ, however, was Dunn's RFC on or before the Date Last Insured March 31, 2015. The evidence supported the RFC finding for this relevant period.

The RFC determination and Shelton's opinions supported the ALJ's Step 5 finding that Dunn could perform a significant number of jobs in the national economy through her Date Last Insured.  The ALJ's decision that Dunn was not disabled through the Date Last Insured was supported by substantial evidence.

Dunn argues that Voss' statements that Dunn could sit comfortably were just "a software option under the 'general' section of the physical exam notes.  Dunn Motion, at 10 of 13.[2]  This argument is meritless.  Dunn offers no proof for this assertion.  The ALJ could rely on health care professionals' observations recorded in the medical records, including Voss' observations, unless some evidence to the contrary existed in the record.  Dunn has failed to cite to any such contrary evidence and the Court has found none.

Dunn complains that the ALJ relied on the observation by healthcare professionals that Dunn was in no acute distress.  The Court agrees that the observation of "not acute distress" is often not relevant to determining an RFC.  The ALJ's use of the phrase in this case, however, was harmless because ample additional evidence supported the RFC finding.  Any error

---

[2] The Court cites the CM/ECF pagination because Dunn's counsel did not paginate the Dunn Motion.

would not have affected the outcome.  See Hill v. Colvin, 807 F.3d 862, 869

(7th Cir. 2015).

The ALJ's treatment of Dr. Seaman's opinions was also supported by

substantial evidence.  The ALJ must give the opinions of a treating

physician controlling weight if the opinions are supported by objective

evidence and are not inconsistent with other evidence in the record.  20

C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir.

2008).[3]  In this case, the ALJ correctly concluded that Dr. Seaman's

opinions were not consistent with the evidence of Dunn's functional

limitations prior to the Date Last Insured.  In 2014 and 2015, Dr. Seaman

repeatedly noted that Dunn could ambulate independently through the Date

Last Insured; Dr. Derian's cardiac examinations and testing showed normal

cardiac function; Dunn told Dr. Derian in May 2015 that she no longer had

chest pains; Dr. Sullivant found in June 2015 that Dunn had normal

strength; Dunn told Dr. Sullivant that she walked once a day with her

children; Dunn told Dr. Seaman that she tried to walk twice a day, but the

second walk made things worse; the April 28, 2015 and August 18, 2015

---

[3] The Commissioner changed the regulations regarding the interpretations of medical evidence.  The amendments apply prospectively to claims filed on or after the amendment's effective date of March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

x-rays showed no degenerative changes and abnormalities in Dunn's right hip months after the Date Last Insured.  Dunn told mental healthcare professional Morgan that she stopped working because of the heavy lifting, but she volunteered "a lot" because she did not have to do any heavy lifting and did not have to be on her feet all the time.  Dr. Seaman's opinions about Dunn's limitations through the Date Last Insured were inconsistent with all this evidence.  The ALJ had more than an ample basis to discount Dr. Seaman's opinions of Dunn's limitations through the Date Last Insured. The ALJ also properly discounted Dr. Seaman's other conclusory statements, such as the one on November 3, 2016, that Dunn was disabled.  That issue is properly left to the Commissioner.  20 C.F.R. § 404.1527(d).

THEREFORE, IT IS ORDERED that the Defendant Commissioner's Motion for Summary Affirmance (d/e 18) is ALLOWED, Plaintiff Cristy Dunn's Brief in Support of Motion for Summary Judgment (d/e 14) is DENIED, and the decision of the Commissioner is AFFIRMED. THIS CASE IS CLOSED.

ENTER:   April 28, 2020

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE